STATE AND ANOTHER v. ST. PAUL CITY RAILWAY COMPANY AND ANOTHER.[1]

February 21, 1936.

No. 30,439.

[1]Reported in 265 N. W. 434.

*Harry H. Peterson,* Attorney General, and *Frederic A. Pike,* Deputy Attorney General, for appellant State of Minnesota.

*John L. Connolly* and *Louis P. Sheahan,* for appellant City of St. Paul.

*Doherty, Rumble & Butler,* for respondent St. Paul City Railway Company.

*Junell, Driscoll, Fletcher, Dorsey & Barker,* for respondent Minneapolis Street Railway Company.

HILTON, JUSTICE.

An appeal from a judgment of the district court setting aside an order of the railroad and warehouse commission of the state of Minnesota requiring that the St. Paul City Railway Company and the Minneapolis Street Railway Company sell two tokens for 15 cents during a temporary trial period.

On November 3, 1934, the railroad and warehouse commission, in a proceeding instituted on its own initiative, issued an order which provided:

"It is Ordered, that from and after the date of this order, and for the period of four (4) months from such date, the Saint Paul City Railway Company and the Minneapolis Street Railway Company place on sale within the territory served by such companies, tickets or tokens on the basis of two for fifteen cents, each such ticket or token to cover one ride within the area now authorized and with transfer privileges to remain unchanged * * *"

From that order the St. Paul City Railway Company and the Minneapolis Street Railway Company (hereinafter referred to as the company) appealed to the district court for an order staying the order of the commission pending determination on its merits of

an appeal from the order. On November 13, 1934, an order was made by that court granting a temporary stay. On January 10, 1935, the district court, after a trial to the court, made and filed its findings of fact, conclusions of law, order for judgment, and judgment setting aside and vacating the order of the commission. From the judgment entered, the city of St. Paul and the state of Minnesota (hereinafter referred to as the city) appeal.

It is contended by the city that the order of the commission was not an appealable order on the grounds:

(1) That said order is not a final order;

(2) That said order did not fix a rate;

(3) That said order is temporary in nature; and

(4) That such an appeal constitutes an undue interference with the orderly progress of the proceedings before the commission.

The city grants that the commission acted under the authority of that part of 1 Mason Minn. St. 1927, § 4823, which reads as follows:

"Thereafter the Commission may on its own initiative and shall upon the application of the city or the street railway from time to time make such investigation as to any change in property value or cost of service as may be reasonably necessary and after a full hearing as herein provided make such order confirming existing rates or changing rates as may be just, to properly regulate rates of fare hereunder."

The city has assumed rather an anomalous position. First it claims that the order did not fix a rate, and then it justifies the order under a section of the statute that grants to the commission the power to fix rates. Either the order did fix a rate or the commission had no power to make it. We will assume that it fixed a rate.

1 Mason Minn. St. 1927, § 4825, provides in part:

"Any city or street railway may appeal from any order, ruling or decision of the Commission duly made after hearing to the District Court of the county in which the city affected by any such

order, ruling or decision is located. * * * Upon such appeal the matters involved therein shall be tried and determined by the court without a jury, in the same manner as though originally commenced therein, * * *. Upon any appeal the District Court shall have jurisdiction of and shall try the whole matter in controversy including matters of fact as well as law, and make findings upon all material facts, and in any case involving rates or the value of street railway property shall find and determine the fair value of such property and also what is a reasonable rate of return thereon, and shall affirm, modify or reverse any order or finding of such commission as may be required by law."

The fact that the order was temporary in character can make no difference as to the decision of this question. Section 4825 makes no exception in granting the right to appeal whether the order is temporary or not. It specifically states that there may be an appeal from "any order." A temporary order which affects substantial rights, as does the order here in question, may be just as confiscatory as a permanent order, and not to allow judicial review of it would be in violation of the due process clause.

City of St. Paul v. Railroad & Warehouse Comm. 163 Minn. 274, 203 N. W. 972, 973, is not in point. There the city of St. Paul sought to appeal from a finding of the commission as to the value of the St. Paul Street Railway. This court held that such a finding was not an "order, ruling or decision" within the meaning of § 4825. We stated in that case [163 Minn. 277] : "The fact of primary importance is that the commission has not fixed a rate." Here the contrary can be stated; the fact of primary importance is that the commission has fixed a rate. In City of Duluth v. Railroad and Warehouse Comm. 167 Minn. 311, 209 N. W. 10, it was held that § 4825 expressly granted the right of judicial review over any order of the commission fixing a rate.

We pass to the merits. During the course of the hearing in the district court the parties stipulated as follows:

"It is stipulated on this trial that the sole issue involved is the question of whether or not this order in question will have the

effect of materially diminishing the revenues of the companies, and that if the Court finds from the evidence adduced, that the order will have such effect, that the Court may set the order aside without further evidence; thus eliminating from the trial of this case all questions of values and fair return upon the values."

The trial court construed the word "materially" as here used to mean:

"If it would be a mere trifling amount, or a few dollars, it would be disregarded. If it was a substantial amount running into a number of thousands of dollars, it would be taken as being the sense of the stipulation."

To this construction counsel for both the city and the company agreed. Thus the only question for this court is whether the evidence supports the finding of the trial court that the rate, if put into effect, would materially reduce the income of the company. We think that it does.

Previous to the time that the order of the commission here in question was made the fare on the streetcars of the company was at the rate of six tokens for 45 cents or ten cents cash fare. Each token or cash fare entitled the passenger to one ride with transfer privileges. Over a period of years from 10 to 12 per cent of the total passengers carried by the company paid cash fares. This is a considerable portion of its revenue.

Five employes of the company, with many years' experience as combination conductors and motormen, testified, as a result of an observation, that the cash fares were received from the better dressed class of passengers; that such passengers more often than not gave them a dollar from which they had to make change; that these passengers consisted of the owners of cars who for some reason or other were not using them that particular day; the occasional shopper, the farmer who came to town and parked his car at the end of the streetcar line, and the stranger who appeared to be making a business call from one part of the city to the other. A great many of the regular passengers would buy as many as 12 tokens at one time and apparently never paid cash fares. It is

evident that the cash fare passengers are not those who cannot afford to pay 45 cents at one time for tokens. The company claims that these cash fare passengers would, if possible, buy two tokens for 15 cents instead of paying cash fares as generally it is necessary for such passengers to make a trip each way whenever they ride the streetcars.

A Mr. Strouse and a Mr. Nash were called as expert witnesses on behalf of the company. Strouse had been with the company for over 40 years and was an executive officer, a position which required that he constantly analyze the business operations of the company. Nash had had long experience, 40 years, in the field of rate-making and valuations. He was vice president of a national organization devoted to such purposes and in charge of valuation and rate-making. These two experts testified to facts, supported by exhibits, which showed the trend of the business of the company and of streetcar companies elsewhere during the past few years. Data had been worked out in great detail. Records, introduced into evidence, had been kept by the company relative to the number of passengers carried during the recent years; the variation from one month to the next during the same year; the number of passengers carried before and after a change in the rate of fare charged, and much other similar data.

On the basis of their own experience, and after hearing the testimony of the conductors and motormen, and with particular reference to the data introduced into evidence in the form of exhibits, the two experts were permitted to state, as their opinion, that the proposed rate, if placed in operation, would result in the use of tokens by 80 per cent of those passengers who, under existing rates, pay cash fares. To offset this loss the company would have to gain a new passenger for every three that quit paying cash fares. There was no evidence that such a change would result in a gain of any new passengers. Assuming that there would be the 80 per cent change, it would mean a reduction in the revenue of the company of $220,000 a year. There is no doubt that such is a material reduction within the terms of the stipulation. Even a much less amount would be.

462

The city strenuously argues that the opinion testimony of the experts was conjectural and speculative and should have been excluded by the trial court. There is no question of testimonial qualifications here. Expert opinion has been permitted in a number of situations such as the cause of death, speed of moving objects, physical condition, value, law, mental capacity, corporal appearance, emotions, handwriting, sanity, etc. 4 Wigmore, Evidence (2 ed.) § 1933, *et seq.*; 2 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 3322. Wide discretion is given to the trial court in this matter. Lindquist & Carlson, Inc. v. Johanson, 182 Minn. 529, 235 N. W. 267; Madsen v. Latzke, 140 Minn. 325, 168 N. W. 11; Lead v. Inch, 116 Minn. 467, 134 N. W. 218, 39 L.R.A.(N.S.) 234, Ann. Cas. 1913B, 891. In the instant case the trial court was not in as good a position as were the experts to draw conclusions and inferences from the evidence adduced at the hearing. See Jones v. Burgess, 124 Minn. 265, 144 N. W. 954; Noe v. G. N. Ry. Co. 168 Minn. 259, 209 N. W. 905; Gibson v. Iowa Cent. Ry. Co. 115 Minn. 147, 131 N. W. 1057.

The city further contends that the testimony should have been excluded because of the fact that the opinion goes to the very issue before the court. However, that fact does not necessarily call for its exclusion. State v. Cox, 172 Minn. 226, 215 N. W. 189; Tracey v. City of Minneapolis, 185 Minn. 380, 241 N. W. 390; Milliren v. Federal L. Ins. Co. 186 Minn. 115, 242 N. W. 546. It would seem that if the opinion testimony is proper in the first place, then to exclude it merely because it goes to the very issue before the court might deprive the party of its only means of proof.

Many cases are cited in support of the proposition that the only way the effect of the commission's order can be determined is by an actual test period in St. Paul and Minneapolis. The city admits that the company is making only about three per cent on its investment under the existing rates. The cases cited by the city do not necessarily support the theory that a test period is the only way to determine the effect of a new rate. In most of them there was a real question as to whether the proposed rate would increase or decrease the earnings of the utility in question. See City of

Knoxville v. Knoxville Water Co. 212 U. S. 1, 29 S. Ct. 148, 53 L. ed. 371; Willcox v. Consolidated Gas Co. 212 U. S. 19, 29 S. Ct. 192, 53 L. ed. 382, 48 L.R.A.(N.S.) 1134, 15 Ann. Cas. 1034; City of Louisville v. Cumberland Tel. & Tel. Co. 225 U. S. 430, 32 S. Ct. 741, 56 L. ed. 1151; Capital City Gaslight Co. v. City of Des Moines (C. C.) 72 F. 829. In the instant case there was no evidence of any kind that the proposed rate would result in an increase of revenue. Hence we do not have the question as to whether or not the rate would be compensatory. In most of the cases where an actual test period was held necessary it was because the particular facts required such as being the only manner by which the effect of the rates could be determined. In City of Louisville v. Louisville Home Tel. Co. (C. C. A.) 279 F. 949, 956, the court stated:

"It is said that, before an injunction issues suspending a legislatively fixed rate, there should be a trial period. This has often been thought a proper preliminary step * * * though we think the conclusion has always been a discretionary one upon the facts of the particular case, and that there has never been any hard and fast rule to that effect."

See also Continental Trust Co. v. United Rys. & Elec. Co. (D. C.) 7 F. Supp. 265; Seaboard Air Line Ry. Co. v. Railroad Comm. (C. C.) 155 F. 792, 808.

The cash fares taken in by the company here vary from day to day and from month to month depending upon many unpredictable conditions. It would seem that no particular four-month test period would be absolutely determinative of the effect of the proposed rate. The opinion of the experts at least is relatively as reliable as would be such an actual trial period. Under the city's contention the company would be required to acquiesce in a trial period that might result in confiscation of its property in order to determine if there would be confiscation. The company cannot be required to submit to that. The trial court in its memorandum stated:

"Neither the State nor the Cities offered any evidence in support of the order of the Commission, and under the stipulation I am unable to find any basis for sustaining the order."

464

We are in accord with the conclusion thus reached.

Affirmed.

DEVANEY, CHIEF JUSTICE (dissenting).

I cannot concur in the decision of the majority and therefore respectfully dissent.

The majority opinion is an attempt to rationalize a conclusion based upon evidence presented on behalf of the St. Paul City Railway Company and the Minneapolis Street Railway Company that is speculative and theoretical. This evidence in my opinion does not sustain the burden of proof which is on these companies to show that the order of the railroad and warehouse commission materially diminishes their revenues. In a case of this kind the only fair and logical way to determine the effect on the revenues of these companies of giving passengers the privilege of purchasing two streetcar tokens for 15 cents without resort to conjecture is by an actual test period. City of Knoxville v. Knoxville Water Co. 212 U. S. 1, 29 S. Ct. 148, 53 L. ed. 371; Willcox v. Consolidated Gas Co. 212 U. S. 19, 29 S. Ct. 192, 53 L. ed. 382, 48 L.R.A. (N.S.) 1134, 15 Ann. Cas. 1034; City of Louisville v. Cumberland Tel. & Tel. Co. 225 U. S. 430, 32 S. Ct. 741, 56 L. ed. 1151; Capital City Gaslight Co. v. City of Des Moines (C. C.) 72 F. 829; Central of Georgia Ry. Co. v. McLendon (C. C.) 157 F. 961. The commission has fixed a trial period of four months for the purpose of determining the effect of this rate. I do not believe that this period is an unreasonable length of time or that it imposes an undue hardship on these two companies.

The judgment of the trial court vacating the order of the commission should be reversed.